# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM J. MARTIN, individually and on behalf of all others similarly situated, | Civ. Action No. 22-cv-4776 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| MEREDITH CORPORATION, MEREDITH HOLDINGS CORPORATION, IAC/INTERACTIVECORP, DOTDASH MEDIA, INC., and DOTDASH MEREDITH, INC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff William J. Martin, individually and on behalf of all others similarly situated, alleges as follows:

## I.  NATURE OF ACTION

1.      Nearly one million times a day, Dotdash Meredith serves video content on its People.com website to visitors anxious for the latest in entertainment news, celebrity gossip, and other tabloid fodder. This lighthearted fare provides a much-needed casual distraction for many during long workdays sequestered at home during the COVID-19 pandemic.

2.      Unbeknownst to the viewers of these videos, Dotdash Meredith has a hidden agenda: tracking and recording each viewer's video-consumption habits, and having that information with Facebook, and potentially other third parties.

3.      Every time a Registered User (as defined herein) views video content on People.com, Dotdash Meredith causes the identity of the viewer and the titles of the videos viewed to be shared with Facebook. The fact that Dotdash Meredith shares this sensitive and private video information with a third party is not disclosed to Registered Users, and Dotdash Meredith does not

ask Registered Users if they consent to having their private video-consumption information shared in this manner. Dotdash Meredith's under-the-table trafficking in this sensitive information of Registered Users is not just an affront to their privacy rights: it is a violation of numerous federal and state laws.

4.      Dotdash Meredith's websites, particularly People.com, are among the largest and most frequently viewed providers of video content on the internet. The scale of Dotdash Meredith's video empire is staggering: Dotdash Meredith has said that People.com records 29 million video views every month.[1] Accordingly, Dotdash Meredith annually commits *hundreds of millions of privacy violations* by sharing video-viewing records without the express written consent of the viewer.

5.      The People.com websites include code, called the Facebook Pixel, which tracks and records viewers' behavior on the websites, including behavior related to video consumption. Behind the scenes of the webpages that display these videos—and unbeknownst to video viewers—this code collects video-watching history and discloses it to Facebook, and ties that information directly to the real-world identity of the viewer by disclosing the viewer's unique Facebook ID in conjunction with the title of each video the viewer watches, contained in the website url.  This invasive conduct occurs without the knowledge or consent of Registered Users of People.com.

6.      This class action lawsuit seeks redress for Dotdash Meredith's unlawful sharing of highly sensitive personal information in violation of several of those laws, including the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA"), California Civil Code § 1799.3, and the consumer protection statutes of several states.  Recognizing that an individual's media viewing

---

[1]      https://www.meredith.com/brand/people

habits constitute highly private, sensitive information, Congress responded by enacting the VPPA to stop its unfettered disclosure. The Senate Report on the VPPA declared: "Acknowledging the relationship between the right of privacy and intellectual freedom is a central part of the first amendment… Protecting an individual's choice of books and films is a second pillar of intellectual freedom under the first amendment."[2]

7. The VPPA was enacted because information relating to the videos a person has viewed is intimate and personal, and the disclosure of this information without the viewer's consent is a violation of one's dignity and of the right to privacy enjoyed by all Americans.

8. The VPPA protects consumers from the disclosure of records relating to their video-viewing histories without their express written consent. It was designed to protect Americans from the exact behavior that Dotdash Meredith has been engaged in on its People.com website. The VPPA protects these crucial and important privacy rights by allowing consumers to determine whether to allow records relating to their video-watching habits to be disclosed at all, and if so, under what circumstances and to whom.

9. As technology has evolved, the VPPA has kept pace, both through legislative amendments and decisional law, to protect viewers from the disclosure of records relating to video content that is distributed online or streamed, the method by which most video content is enjoyed today. The rise of the internet age has not diminished the importance of privacy; it has heightened it. Phrases like "clear your browser history" has become part of our common lexicon, and often

---

[2] United States Senate Committee on the Judiciary, *Report on the Video Privacy Protection Act of 1988*, S. Rep. No. 100-599, at 4 (1988), *available at* https://epic.org/wp-content/uploads/privacy/vppa/Senate-Report-100-599.pdf (hereinafter "VPPA Senate Report").

hold their greatest relevance in the video privacy context. In 2012, the VPPA was amended to remove any doubt that it applied online.[3]

10. States have also recognized that video-viewing records, including records related to video content that is distributed online or streamed, constitute sensitive, private information that must be protected. California has enacted Civil Code § 1799.3, which, similar to the VPPA, prohibits the disclosure of video-viewing records without express written consent. As have Michigan, New York, Iowa, Delaware, Minnesota, Connecticut, New Hampshire, Louisiana, and Maryland, Massachusetts, Rhode Island, and Tennessee.

11. Dotdash Meredith's invasive disclosures violate the VPPA, which explicitly prohibits the disclosure of video-viewing records to a third party without the express written consent of the consumer of the video; and they are violations of other privacy laws as well.

12. Plaintiff brings this action to redress Dotdash Meredith's unlawful conduct.

## II.     THE PARTIES IN THIS CLASS ACTION

### A.     Plaintiff

13. Plaintiff William J. Martin ("Mr. Martin") is, and at all times relevant to this action, has been, a resident of California. Mr. Martin has been an active subscriber of People.com since at least November 2020, and he watches videos on their website daily. Mr. Martin frequently watches videos on the People.com website that relate to politics, travel, and new movie/music releases. Mr. Martin has never paid for a People.com subscription but did sign up to receive their

---

[3]     *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 3 (2012) ("Streaming is the future of video, but no judge has ever decided whether or not the Video Privacy Protection Act covers streaming video companies. I think it is clear that the law does cover new technologies like streaming because it does not just cover 'prerecorded video cassette tapes.' It also covers 'similar audio-visual materials.'").

free newsletter and alerts to his email account on a regular basis about topics that are of interest to him.  Mr. Martin has visited the People.com website both directly and indirectly through his Facebook page.

**B.     Defendants**

14.     Defendant Meredith Corporation ("Meredith Corporation") is a corporation organized under the laws of Iowa, with its corporate headquarters located at 1716 Locust Street, Des Moines, Iowa, 50309, and its principal place of business located at 225 Liberty Street, New York, New York 10281. Upon information and belief, it was re-registered with the Securities and Exchange Commission as "Hawkeye Acquisition, Inc." on or about December 1, 2021. It is currently a wholly owned subsidiary of Gray Television, Inc., a Georgia Corporation.

15.     Defendant Meredith Holdings Corporation ("Meredith Holdings Corporation") is a corporation, organized under the laws of Iowa, with its corporate headquarters located at 1716 Locust Street, Des Moines, Iowa, 50309, and its principal place of business located at 225 Liberty Street, New York, New York 10281. Meredith Holdings Corporation was formerly a wholly owned subsidiary of Meredith Corporation.

16.     Defendant IAC/InterActiveCorp ("IAC") is a corporation organized under the laws of Delaware. Its principal place of business is 555 West 18th Street, New York, New York 10011.

17.     Defendant Dotdash Media, Inc. ("Dotdash") is a corporation organized under the laws of Delaware. Its principal place of business is 28 Liberty Street, New York, New York 10005. Dotdash is a wholly owned subsidiary of IAC.

18.     Defendant Dotdash Meredith, Inc. ("Dotdash Meredith") is a corporation, organized under the laws of Delaware. Its principal place of business is 28 Liberty Street, New York, New York 10005.

19.     Hereinafter Defendants Meredith Corporation, Meredith Holdings Corporation,

IAC/InterActiveCorp, Dotdash, and Dotdash Meredith are referred to collectively as "Defendants."

20.     On October 6, 2021, Meredith Corporation and IAC agreed to a merger.[4] Under that agreement, Dotdash, a wholly owned subsidiary of IAC, merged with Meredith Holdings Corporation. Meredith Holdings Corporation continued as the surviving company in the merger, in a newly formed subsidiary of Dotdash to be incorporated in Iowa, called Dotdash Meredith. The company ultimately formed was incorporated in Delaware.

21.     Upon information and belief, Dotdash Meredith is the successor-in-interest to Meredith Holdings Corporation. Dotdash Meredith owns and continues to operate the business units relevant to this class action.

22.     Upon information and belief, other assets of Meredith Corporation and Meredith Holding Corporation, not relevant to this class action, were acquired by Gray Television, Inc. ("Gray"), a corporation organized under the laws of Georgia.

## III.    JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 because Plaintiff's claims against Defendants arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

24.     In the alternative, this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), because at least one member of the class of Plaintiffs is a citizen of a different state than all Defendants, and the amount in controversy exceeds $5,000,000.

25.     The Court also has supplemental jurisdiction over the related state law claims under

---

[4]     IAC/Interactive Form 8K, Oct. 7, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1800227/000110465921123899/tm2129390d1_8k.htm.

28 U.S.C. § 1367 because these claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

26.     The Court has personal jurisdiction over Defendants because each has substantial, continuous, and systemic contacts with the state of New York. Each Defendant has purposely availed themselves of the benefits of New York, and the claims at issue in this class action directly relate to Defendants' contacts with New York.

27.     Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claims in this action took place in this district.  *See* 28 U.S.C. § 1391(b).

## IV.     ALLEGATIONS

### A.     Dotdash Meredith

28.     Dotdash Meredith is one of the world's largest online media companies.

29.     IAC is a large media conglomerate.  IAC claims to own brands in over 100 countries, including the United States.  IAC itself reported a total revenue in 2020 of $3.047 billion.[5]

30.     Dotdash, a wholly owned subsidiary of IAC, primarily published articles and videos online. Its reported revenue in 2020 was $213.8 million.[6]

31.     Upon information and belief, before Meredith Corporation and Meredith Holdings Company (collectively "Meredith") merged with other companies, Meredith was one of the largest media companies in the world. "Meredith produce[d] service journalism that engage[d] audiences with essential, inspiring, and trusted content reaching consumers where they are across multiple

---

[5]     IAC/Interactive Corp., Form 10K, Feb. 17, 2021, *available at* https://ir.iac.com/static-files/1a77d362-26f8-48aa-a024-b45b233d3426

[6]     *Dotdash is Now IAC's Growth Machine*, July 27, 2021, *available at* https://www.amediaoperator.com/newsletter/dotdash-is-now-iacs-growth-machine/

platforms including digital, video, print, and broadcast television."[7]

32.     Meredith maintained at least 39 websites and applications, which Meredith claimed reached more than 150 million consumers every month.[8]

33.     In 2019, on an earnings call, Tom Harty, Meredith's president and CEO, claimed that Meredith's "audience reach is now 115 million or 90% of all American women" and that "[Meredith is] a top 10 digital media company…"[9]

34.     Harty continued to say that "We also plan to invest in new digital platforms, more robust video production and other activities that will drive increased consumer engagement."[10]

35.     In 2021, Meredith recorded 5 billion video views on its platforms.[11]*Id*.,

36.     Meredith's digital reach extended and continues to extend into social media. In 2021, Meredith reported that it reached approximately 88 million Facebook fans, 48 million Twitter followers, 48 million Instagram followers, over 15 million Pinterest followers, and over 10 million YouTube subscribers.[12]

37.     Meredith delivers content to Registered Users and other website visitors in multiple ways: "Today Meredith uses multiple media platforms—including print, digital, video, audio, and broadcast television—to provide consumers with content and experiences they desire."[13]

---

[7]     Meredith Corporation, *2021 Annual Report*, at 32 (hereinafter "2021 Annual Report").

[8]     Meredith Corporation Form 10K for the fiscal year ending June 30, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0000065011/000006501121000079/mdp-20210630.htm (hereinafter "Meredith June 2021 Form 10K")

[9]     2019 Quarter 4 Meredith Earnings Call Transcript.

[10]     2019 Quarter 4 Meredith Earnings Call Transcript.

[11]     2021 Annual Report at 5.

[12]     Meredith June 2021 Form 10K.

[13]     Meredith June 2021 Form 10K.

38.     Of these platforms, Meredith continually tailored its offerings to deliver video content. In 2018, then-Executive Chairman Stephen Lacy said "we've significantly accelerated our digital scale. We now deliver nearly 140 million monthly unique visitors and 9 billion annual video views. This scale moves us solidly into the top ten among U.S.-based companies as ranked by traffic."[14]

39.     Meredith's business strategy has long put a heavy focus on digital viewers and video content. As Lacy said in late 2018: "The acquisition [of certain Time, Inc. properties] advances our digital position by adding significant scale with nearly 135 million monthly unique visitors and over 9 billion annual video views we now operate the leading network of premium content digital brand."[15]

40.     Meredith continued to invest in digital content and delivery up until the merger with Dotdash, and increasingly tailored its systems to the distribution of video content. In 2020, Harty reported that

> As a reminder, these [goals] are building an integrated digital platform and strengthening our data and audience targeting tools. The new platform brings together the legacy narrative and timing digital assets to a common content management system … Creating more video, the market for digital video related advertising is expected to grow 30% faster than non-video display advertising, and accounts for more than half of the total digital display ad spending in 2020 according to eMarketer. We are seeing early and strong results from our video production work with video views and revenues across our owned and operated sites up in the double-digits in our fiscal second quarter.[16]

41.     Harty later reported that:

---

[14]     2018 Quarter 3 Meredith Earnings Call Transcript.

[15]     2018 Quarter 4 Meredith Earnings Call Transcript.

[16]     2020 Quarter 2 Meredith Earnings Call Transcript.

> We [Meredith] have a large asset library of evergreen content. At last count, it contains 6 million editorial images, illustrations and videos. All our television stations remain open to serve their communities. So some of that investment might be pulled back. But the big areas that we've been – we've talked about in the past is video. So we – that was a huge part of the digital investment that if we knew if we could create more video, we could monetize that, and that's been our plan, and we've been doing that. And then obviously, content to commerce, as we talked about, was Dan's question. If we create more content online that is shoppable, that's an area that we've been making investments in also.[17]

42. Digital media generally, and video in particular, formed a major part of Meredith's operations.

43. Meredith reported $2.97 billion in revenue in 2021, with 51% of that revenue coming from advertising.[18] In 2021, Meredith's revenue from digital ads surpassed its revenue from print ads.[19]

44. Meredith Corporation stated that it intended to be a "digital first" company: "The combination of the pending sale … and digital advertising surpassing magazine sets the stage for post-transaction Meredith to be positioned as a 'digital-first' media company with low-leverage and the capacity to invest in future organic and inorganic growth."[20]

45. Meredith also developed, produced, and distributed its own video content on all platforms, including online, through its Meredith Video production division, which is its digital and multi-platform video production division.[21]

---

[17]    2020 Quarter 3 Meredith Earnings Call Transcript.

[18]    Meredith Corporation 2021 Annual Report.

[19]    Meredith Corporation 2021 Annual Report.

[20]    Meredith June 2021 Form 10K.

[21]    https://www.meredith.com/marketing-capabilities/video-production

46.     In late 2021, Meredith Holdings Corporation was acquired for $2.7 billion by IAC to form Dotdash Meredith, now one of the ten largest internet companies by audience in the world.[22]

47.     Continued growth in video distribution has been a key part of Meredith's strategy. In its June 2021 Investor Update, in reference to the merger with Dotdash, Meredith said that "As part of our strategy, we will accelerate investment in growing platforms such as mobile, audio, and video to serve audiences wherever they choose to consume our content."[23] Upon information and belief, the merger with Dotdash was part of that strategy.

48.     Dotdash Meredith's chief executive officer, Neil Vogel, has described the company as a "digital-first business."[24] Dotdash Meredith anticipates that about 70% of its earnings will come from digital properties.[25]

49.     The distribution of video content is a major focus of Dotdash Meredith's online presence. Unlike many internet companies, which rely more heavily on a large volume of advertising, Dotdash has traditionally focused on "intent-based content," which they believe leads

---

[22]     Marc Tracy, *Barry Diller's Dotdash Agrees to Buy Meredith, a Magazine Giant*, N.Y. Times, Oct. 6, 2021, updated Nov. 15, 2021, *available at* https://www.nytimes.com/2021/10/06/business/media/dotdash-buys-meredith-magazines.html

[23]     Meredith Corporation, Transcript of June 2021 Investor Update, *available at* https://s21.q4cdn.com/842953260/files/doc_downloads/transcript/MDP-at-IDEAS-Conference-script-FINAL.pdf

[24]     Dotdash Meredith, *Press Release*, Dec. 1, 2021, *available at* https://www.prnewswire.com/news-releases/iacs-dotdash-announces-close-of-meredith-transaction-301435581.html.

[25]     Dotdash Meredith, *Press Release*, Dec. 1, 2021, *available at* https://www.prnewswire.com/news-releases/iacs-dotdash-announces-close-of-meredith-transaction-301435581.html.

to more valuable advertisements.[26]

50.     Upon information and belief, this approach depends on content, like videos, which generates deeper user engagement. In the words of a Dotdash Meredith employee, "[w]e're also very interested in developing a long-form video strategy; one which really focuses on the lifetime value of the video library."[27]

51.     Upon information and belief, Dotdash Meredith has continued the operations of Meredith's 39 (or more) websites and applications, which it claims reach 150 million consumers each month. Dotdash Meredith's online content is heavily focused on videos.

**B.     People.com**

52.     Dotdash Meredith operates the website **www.people.com** ("People.com").

53.     In 2019, Meredith's CEO said that "Our flagship PEOPLE brand is the crown jewel of our brands. PEOPLE reaches nearly 100 million adults or 40% of all adult Americans across all media platforms. It reaches more consumers than the combined audiences for the Oscars, Golden Globes and the Emmys. Last month, people.com served 76 million unique visitors according to Comscore."[28]

54.     Upon information and belief, People.com is one of the most popular websites in the world. It is one of the top-twenty "news and media" sites in the world and now receives over 79 million monthly visits.

---

[26]     *IAC/InterActiveCorp: Adding Meredith To IAC - The Tech Version Of Berkshire Hathaway*, Nov. 17, 2021, *available at* https://seekingalpha.com/article/4470196-adding-meredith-to-iac-the-tech-version-of-berkshire-hathaway

[27]     Esther Kezia Thorpe, *Meredith's Video Push Centers on Diversity and diversification*, June 24, 2021, *available at* https://digitalcontentnext.org/blog/2021/06/24/merediths-video-push-centers-on-diversity-and-diversification/

[28]     2019 Quarter 4 Meredith Earnings Call Transcript.

55. Video content is a major focus of People.com. Upon information and belief, almost all of People.com's content pages include a video, and some of its content consists entirely of videos. For example, the image below is a capture of a page on People.com embedding a video:

PEOPLE.COM > COUNTRY

# Jimmy Fallon Teases Blake Shelton About Not Making the Guest List for Wedding to Gwen Stefani

Blake Shelton and Gwen Stefani tied the knot in July at Shelton's Oklahoma ranch

By Natasha Dado | December 03, 2021 10:27 AM





Jimmy Fallon is letting Blake Shelton know how he feels about not making the cut!

The *Tonight Show* host, 47, playfully confronted the 45-year-old country

56.     People.com embeds videos in different formats, and from many different sources. The image below includes another such example:



57.     People.com has over 29 million video views every month.[29]

58.     People.com's "Media Kit," which, upon information and belief is used to promote People.com to advertisers, emphasizes its video content.[30]

59.     People.com runs YouTube, TikTok, Twitter, Pinterest, and Instagram accounts where it promotes its videos.[31]

60.     People's LinkedIn page says: "We reach PEOPLE consumers everywhere they are, with a top-40 U.S. website, weekly print magazine, daily podcast, daily TV show and 24/7 coverage across social media platforms."[32] People.com also promotes "People: the TV Show" and includes its content on People.com.

---

[29]     https://www.meredith.com/brand/people.

[30]     *See e.g.*, https://static.people.com/media-kit/phone/index.html#video.

[31]     https://www.meredith.com/brand/people.

[32]     https://www.linkedin.com/company/people-magazine/about/

61.     People.com also links users to one of its companion sites, PeopleTV.com. On information and belief, PeopleTV.com is also owned and operated by Meredith Dotdash. PeopleTV.com's sole purpose is the distribution of video content. PeopleTV.com content frequently appears on People.com. Upon information and belief, one of the reasons that users of People.com visit the website is to access PeopleTV.com content. PeopleTV.com also uses facebook pixel code and, also discloses the same personally identifying video viewing information as People.com does to Facebook.

62.     On information and belief, People.com's business focus was to draw more visitors to its website – including repeated visits by Registered Users –to increase its advertising revenue, which was its primary moneymaking activity.  Drawing visitors to video content is a key part of this focus.

### C.     People.com's Subscribers

63.     Users access People.com through web browsers on both computers and mobile devices.

64.     When someone accesses People.com (a "Visitor"), they are given the option to join the site.

65. The image below is a true and correct copy of the People.com website, showing the option to "Join Now" in the upper right-hand corner:



66. When a Visitor joins People.com (and therefore becomes a "Registered User"), he or she enters an email address and gives Dotdash Meredith his or her full name. Alternatively, the Visitor can become a Registered User by linking his or her Google or Facebook account to People.com, which, upon information and belief, discloses his or her name and identity to Dotdash Meredith.

67. During the registration process, Registered Users are given the option to subscribe to newsletters, as shown in the image below:



68. After a Registered User provides an email address to join People.com, the website sends a verification email to the Registered User's email address, confirming that the Registered User has signed up.

69. The image below is a true and correct copy of a verification email sent by People.com:



70.     As demonstrated by the screenshots below, by registering on People.com, either through entering personal information or linking People.com with a Google or Facebook account, Registered Users receive ongoing communications from People.com, including personally tailored content and links to articles and videos on People.com.

71.     Upon information and belief, Registered Users are also eligible to enter sweepstakes, and receive exclusive offers related to subscriptions to various Dotdash Meredith products.

72.    The image below is a true and correct copy of a portion of the webpage that a Registered User sees after confirming their registration at People.com:



73.    As demonstrated in the screenshot above, People.com indicates that Registered Users have "accounts" at People.com, which can then be accessed and manipulated by choosing the drop-down menu in the upper left-hand corner.

74.    Registered Users also receive several emails a week from People.com, purporting to provide "news" and gossip updates. These emails state that "PEOPLE may receive compensation for some links to products and services in this email." These emails also provide links to video content at People.com.

75.    The images below are true and correct copies of emails sent by People.com to Registered Users.



76.     Upon information and belief, Dotdash Meredith uses various tracking software to monitor its Registered Users' behavior on its websites, including People.com. Dotdash Meredith brags that it has assembled "20+ years of first party data and the best research and data scientists in the business," to "identify trends, insights and activate like no other publisher."[33]

77.     By Dotdash Meredith's own admission, it collects information on Registered Users' demographic information, location, internet activity, interests, and health and fitness information, and uses that information to customize content and advertisements that it presents to Registered Users.[34]

78.     At no point in the registration process are Registered Users required to consent to any Dotdash Meredith policies.

---

[33]     https://www.dotdash.com/our-work/

[34]     https://www.meredith.com/nmg/privacy

79.     At no point do Registered Users give consent to Dotdash Meredith to share their video-viewing behavior with others.

80.     Dotdash Meredith does not obtain consent from Registered Users to share video-viewing history through written, informed consent in a form distinct and separate from any form setting forth other legal or financial obligations.

81.     Upon information and belief, no Class Members opted-in to sharing of their personally identifying information with third parties and People.com does not offer Visitors or Registered Users the ability to opt-in to sharing of personally identifying information with third parties.

**D.     Dotdash Meredith Shares Its Registered Users' Video Viewing With Third Parties**

82.     When a Registered User accesses People.com and watches a video, Dotdash Meredith shares the name of the video and the identification of the viewer of the video with third parties, without first obtaining the consent of the Registered User in a form separate and distinct from any other form setting forth the Registered User's other legal and financial obligations. When a Registered User views a video on People.com, Dotdash Meredith, through its website code, sends the Registered User's identity and the address of the webpage where they are watching the video, which identifies the video, to Facebook without the Registered User's consent.  This conduct, which People.com does millions of times a day, violates the VPPA and other privacy laws.

83.     Upon information and belief, this unlawful disclosure is made through tracking software called the Facebook Pixel, in conjunction with other "cookies" that Dotdash Meredith causes to be placed on the Registered User's browser.

84.     Upon information and belief, Dotdash Meredith's disclosure to Facebook includes the URL of the video and the Registered User's Facebook ID.

85.     The transmission of this information is not the Registered User's decision, but

results from Meredith's purposeful use of tracking software and code on its website, People.com. In fact, Meredith has caused the tracking software to be configured in a manner that leads to this illegal transmission of private information.

86.     This transmission occurs without the consent of the Registered User in a form distinct and separate from any form setting forth their other legal or financial obligations.

### i.     The Facebook ID

87.     Upon information and belief, Facebook identifies each of its users with a "Facebook ID."

88.     A Facebook ID is a unique and persistent identifier that Facebook assigns to each Facebook user. It is typically a string of numbers linked to a specific Facebook account.

89.     With a Facebook ID, anyone can (and throughout the relevant time frame, could) look up the user's Facebook profile, including the user's profile picture and full name.

90.     An individual can be quickly and reliably identified by name and profile picture from a Facebook ID by entering the URL www.facebook.com/####### into a web browser, and replacing the hash-marks with the individual's Facebook ID. This URL will resolve to the individual's Facebook profile, which will show the individual's full name, profile picture, and possibly other identifying information (age, location, hometown, college attended, friends, interests, etc.). Further, on information and belief, Facebook automatically associates Facebook IDs with the identity of the videos transmitted to it.

91.     Facebook also installs "cookies" on Facebook users' web browsers when they visit Facebook.com.

92.     A "cookie" is a type of code that stores information on web browsers.

93.     As Facebook describes them, cookies are "used to store and receive identifiers and their info on computers, phones, and other devices."

94. Upon information and belief, when a user visits Facebook.com, a cookie is created to identify the user's device.

95. The process by which Facebook.com installs cookies into a user's device is as follows:



96. Upon information and belief, when a user logs into his or her Facebook account, the cookie identifying the user's device is associated with the user's Facebook ID. For Facebook

visitors that select the "keep me logged in" option, the cookie remains in their browser for 90 days.

### ii. The Facebook Pixel

97.     Upon information and belief, Dotdash Meredith discloses Registered Users' personally identifiable information to Facebook through a piece of software called the "Facebook Pixel."

98.     The Facebook Pixel is a type of tracking software. It can be used to monitor the behavior of people visiting websites running the Facebook Pixel software.

99.     As Facebook describes it:

> The Facebook pixel is a snippet of JavaScript code that loads a small library of functions you can use to track Facebook ad-driven visitor activity on your website. It relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns.[35]

100.    The Facebook Pixel allows website operators to track the behavior of users of their website: "When someone visits your website and takes an action … the Facebook pixel is triggered and reports this action. This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience."[36]

101.    Upon information and belief, the image below is a true and correct copy of the "Base Pixel" code:

---

[35]     https://developers.facebook.com/docs/facebook-pixel/get-started

[36]     https://www.facebook.com/business/learn/facebook-ads-pixel

```
<!-- Facebook Pixel Code -->
<script>
  !function(f,b,e,v,n,t,s)
  {if(f.fbq)return;n=f.fbq=function(){n.callMethod?
  n.callMethod.apply(n,arguments):n.queue.push(arguments)};
  if(!f._fbq)f._fbq=n;n.push=n;n.loaded=!0;n.version='2.0';
  n.queue=[];t=b.createElement(e);t.async=!0;
  t.src=v;s=b.getElementsByTagName(e)[0];
  s.parentNode.insertBefore(t,s)}(window,document,'script',
  'https://connect.facebook.net/en_US/fbevents.js');

  fbq('init', '215450655589152');
  fbq('track', 'PageView');
</script>
<noscript>
 <img height="1" width="1"
src="https://www.facebook.com/tr?id=215450655589152&ev=PageView
&noscript=1"/>
</noscript>
<!-- End Facebook Pixel Code -->
```

102.    On information and belief, viewing a video on People.com and the other Dotdash Meredith websites triggers the Facebook Pixel code embedded on those websites to report the title of the video and the viewer's Facebook ID to Facebook, even if they are viewing the websites without clicking on a Facebook Ad.

### iii.       How Website Operators Set Up Facebook Pixel

103.    Website operators, like Dotdash Meredith, install the Facebook Pixel on their website by taking publicly-available base code written by Facebook and adding that code to their own webpages, and then supplementing it with additional code based on the "events" that the website wants to track.  The below image outlines this process.



104.    To install the Facebook Pixel, a website operator uses a base code (the "Base Pixel") which is then customized for its website ("Custom Pixel").

105.    To start this process, the website operator uses an online tool, provided by Facebook, called "Events Manager." On the Events Manager page, there is a sub-menu for "Data Sources," where the website operator can choose the information about consumer interactions that

will be collected.



106.     Once the website operator chooses "Web" as the data source, the website operator uses the associated sub-menu to enter the name of its website. Facebook then automatically generates a Base Pixel using the name of the website.

107.     After the Base Pixel has been generated, the website operator must affirmatively take action to install the code on its website.

108.    To install the Base Pixel, a website operator must either install it manually, by copying the code onto its own website's code, or by using a third-party service to install the code for it.



109.    After choosing the manual installation, a website operator can install the Base Pixel by copying the base code and pasting to it website.

## Install Base Code

The pixel code is a snippet of javascript that's added to the header section of your website. The pixel has two parts: the basecode and the event tags.

**1** **Copy base code**

Copy the base code below.

```
<!-- Facebook Pixel Code -->
<script>
!function(f,b,e,v,n,t,s)
{if(f.fbq)return;n=f.fbq=function(){n.callMethod?
n.callMethod.apply(n,arguments):n.queue.push(arguments)};
```

**Copy Code**

**2** **Paste base code to website**

Paste the pixel code into the bottom of the header section just above the </head> tag. Install the base code on every page of your website. Learn more

110.  A website must have the Base Pixel installed on every page on which the website operator wishes to track events.[37]

111.  The Base Pixel, as a default, causes the Facebook Pixel to track the name of the website being viewed and sends the name of the website and the corresponding Facebook ID to Facebook.

112.  The website operator can then either manually add events like "add to cart," using a function, or can generate code to add events using Facebook's development tools, that will send

---

[37]  https://developers.facebook.com/docs/facebook-pixel/implementation/conversion-tracking; *see also* Jon Loomer, *Where is My Base Facebook Pixel Code*, Sept. 1, 2020, *available at* https://www.jonloomer.com/where-is-my-base-facebook-pixel-code/

additional tracking data to Facebook based on the visitor's activation of the custom event.[38]

## Add events using event setup tool

You can use the Event Setup Tool to add standard events and parameters without the need to code. This is the easiest option to install pixel events. Learn More

### How it Works

Use Event Setup Tool to open your website.

Using the Event Setup Tool, select where on your website you'd like to add events.

With a simple click, your event is added to your website without needing to use code.

**Open Event Setup Tool**

⊛ Please make sure your pixel has been installed properly before using the event setup tool

Prefer a manual option? Install events using code.

113.    As noted, once installed, the Facebook Pixel can associate a user of a website with a Facebook ID and therefore a real world identity, using cookies created when that user previously logged into Facebook, and can also associate certain events—such as watching a video—with a Facebook ID and therefore a real world identity.

iv.    **Dotdash Meredith Uses the Facebook Pixel to Disclose Personally Identifiable Information to Facebook**

114.    Dotdash Meredith has installed the Facebook Pixel on People.com.

---

[38]    *See*    https://developers.facebook.com/docs/facebook-pixel/implementation/conversion-tracking

115.    Upon information and belief, Dotdash Meredith is enabled to track when Registered Users view videos and to send that data, along with a Facebook ID, to Facebook.

116.    The image below shows how Dotdash Meredith has configured its Pixel on People.com, showing that it tracks the viewing of videos.  Dotdash Meredith has retained the default settings and has not created any specific events, such as "add to cart" or "checkout" for additional tracking.



117.    With these settings, the Pixel will capture the name of the webpage a Registered User visits and send the name of the website along with the associated Facebook ID to Facebook.

118.    When a Registered User visits a people.com webpage with a video, the name of the video is reflected in the name of the webpage.

119.    In addition, when a Registered User visits a people.com webpage with a video, the video will "auto-play" when the user lands on the page.

120.    When a Registered User with a Facebook ID views video content on People.com,

2060531.2

the Facebook Pixel on that page causes the Registered User's browser to send information about that video, including its title, and the consumer's Facebook ID, to Facebook's servers through a message called a "GET Request."

121.    The following flow chart shows the process through which information is sent from people.com to Facebook.



122.     The image below shows a zoomed in shot of the above HTTP session containing a tracking Pixel from when a Registered User visited People.com and watched the Ryan Reynolds/Blake Lively video referenced above on People.com, and the Facebook ID is transmitted.



123.     The red boxes show that the name of the video was transmitted to Facebook along with the Facebook ID through the "c_user" cookie.

124.     Upon information and belief, this HTTP session shows the result of a Registered User visiting People.com and viewing a video.

125.     Upon information and belief, the information displayed in the HTTP session is transmitted to Facebook by Dotdash Meredith.

126.     Upon information and belief, the information is transmitted to Facebook in the same, or in a substantially similar format, to the screenshot above.

127.     This information allows the recipient, in this case, Facebook, to identify individual users alongside their video-viewing habits.

128.     Dotdash Meredith does not disclose the personally identifiable information to collect debts, fulfill orders, process requests, or transfer ownership.

129.     Dotdash Meredith's primary business is making money from advertisements, and it utilizes the personally identifiable information that it discloses to earn more money from advertising.

130.     Upon information and belief, Dotdash Meredith, and the predecessor corporation, Meredith Corporation, have unlawfully disclosed video viewing habits since at least December 2019, continuing until the present.

131.     Upon information and belief, Dotdash Meredith, or its predecessors, has, through the entire relevant time-period, had sole control of its websites and code. And upon information and belief, Dotdash Meredith re-wrote its website code to include the Facebook Pixel. Thus, Dotdash Meredith's decision to install the Facebook Pixel on People.com was an intentional act, showing that Dotdash Meredith has knowingly and willfully disclosed Registered Users' personally identifiable information. Dotdash Meredith's knowledge is also apparent because Facebook explains in its marketing materials that the Facebook pixel "reports" the actions of Dotdash Meredith's customers to Facebook.



### How the Facebook pixel works

When someone visits your website and takes an action (for example, buying something), the Facebook pixel is triggered and reports this action. This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience. When more and more conversions happen on your website, Facebook gets better at delivering your ads to people who are more likely to take certain actions. This is called conversion optimization.

132.    Upon information and belief, People.com also uses other cookies to track the behavior of Registered Users.

**E.    Harms to Plaintiff and Class Members**

133.    Dotdash Meredith's unlawful disclosure of personally identifiable information, coupled with Registered Users' video-viewing habits, creates concrete harm. **This harm includes, but is not limited to, an invasion of Registered Users' privacy, loss of control over their information, and emotional distress.**

134.    Defendants' disclosure of Registered Users' personally identifiable information has caused economic loss to Class Members, because the personally identifiable information and Class Members' video-watching habits have economic value to Class Members. In obtaining and disclosing this information without consent, Defendants have deprived Class Members of the opportunity to exchange their own information for renumeration.

135.    Registered Users also face harm because they are not presented with a meaningful opportunity to determine how, when, or in what manner their personally identifiable information will be shared. Many Class members would pay a price not to view videos on people.com so as not to share their viewing habits.

136.    Registered Users are also harmed because they have not consented to the disclosure of this information in any form, including a form separate and distinct from any form setting forth their other legal or financial obligations.

137.    Upon information and belief, the disclosure of personally identifiable information alongside video-viewing habits is the specific harm that the VPPA was meant to protect against.

## V.    Class Action Allegations

138.    Plaintiff brings this action on behalf of himself and all others similarly situated under Federal Rule of Civil Procedure 23 because: the class is so numerous that joinder of the

entire class is impracticable; there are common questions of law and fact; the claims and defenses of the Representative Plaintiff is typical of the Class Members and of each respective Subclass; and the Representative Plaintiff will fairly and adequately protect the interests of the Class and each Subclass.

139.    The proposed class is defined as registered users of People.com in the United States with a Facebook account who viewed a video on the People.com website.

140.    Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiff brings this action on behalf of the following subclasses:

141.    The California Subclass: registered users of People.com in California with a Facebook account who viewed a video on the People.com website.

142.    Excluded from the class and subclass are: (i) any judge or magistrate judge presiding over this action; (ii) Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' agents, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the class; and (iv) persons whose claims have been finally adjudicated on the merits or otherwise released.

143.    Plaintiff reserves the right to amend or modify the definition of the proposed Class and Subclasses before any Class or Subclass is certified in this action.

A.      **Numerosity and Ascertainability**

144.    Plaintiff does not know the exact size of the class or the identities of Class Members, because that information is within the possession, custody, and control of Defendant Dotdash Meredith. However, upon information and belief, the Class includes millions of people.

145.    Upon information and belief, People.com is visited by 79 million visitors each month and Facebook has 2.91 billion active monthly users.

146.     Joinder of the entire Class is impracticable because of the overwhelming size of the class.

147.     Despite the size of the Class it is easily ascertainable, because it can be determined through registrations on both People.com and with Facebook.

**B.     Commonality and Predominance**

148.     This matter involves common questions of law and fact which predominate over any question solely affecting individual Class Members.

149.     The common questions of law and fact include, but are not limited to:

- Whether Defendants, through the Facebook Pixel, unlawfully disclosed and continue to unlawfully disclose Class Members' personally identifiable information, including their video-viewing records, in violation of 18 U.S.C. § 2710;

- Whether Defendants' unlawful disclosures were committed knowingly;

- Whether Class Members consented to the disclosures in a written instrument separate and distinct from other forms setting forth other legal or financial obligations;

- Whether Defendant Dotdash Meredith is a "video tape service provider" within the meaning of the VPPA; and

- Whether Defendants' unlawful disclosures were within the "ordinary course of business" under the VPPA;

**C.     Typicality and Adequacy**

150.     Plaintiff Bill Martin's claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar

conduct by Defendant.

151.    Plaintiff is an adequate Class Representatives because his interests do not conflict with the interests of the other members of the Class and Subclasses he seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiff and his counsel.

### D.    Superiority

152.    A class action is the superior method for the fair and efficient adjudication of this action , because the damages and other harms suffered by Plaintiff and other class members are small compared to the burden and expense of individual litigation. Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendant for the harms suffered.

153.    Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

154.    No unusual circumstances exist that would make this matter more difficult

### E.    Final Declaratory or Injunctive Relief

155.    Class certification is also appropriate for injunctive and declaratory relief because Defendants' conduct is generally applicable to the class as a whole and Defendants have acted or refused to act on grounds that apply generally to the class and subclass as a whole.

### F.    Certification as to Particular Issues

156.    Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4).  Their claims consist of issues common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation..

## VI.    CAUSES OF ACTION

### Count 1
### (Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710)

157.    Plaintiff re-alleges and reincorporate the allegations in all preceding paragraphs.

158.    Under the VPPA, a video tape service provider may not knowingly disclose any personally identifiable information regarding any consumer to third party without the informed, written consent of the consumer.

159.    Dotdash Meredith is a video tape service provider within the meaning of 18 U.S.C. § 2710(a)(4). All Plaintiff and Class Members are consumers within the meaning of 18 U.S.C. § 2710(a)(1).

160.    Dotdash Meredith, by installing and using the Facebook Pixel, has knowingly disclosed Plaintiff's and Class Members' personally identifiable information, including their Facebook IDs and the names of videos that they viewed on Dotdash Meredith's websites.

161.    Plaintiff and Class Members did not consent to these disclosures, nor did Dotdash Meredith obtain their consent for the disclosures through informed written consent in a form distinct and separate from any other form setting forth other legal or financial obligations.

### Count 2
### (Violations of California Civil Code § 1799.3)

162.    Plaintiff re-alleges and reincorporate the allegations in all preceding paragraphs.

163.    Defendants are providers of video recording sales or rental services within the meaning of California Civil Code § 1799.3(a).

164.    Defendants, by installing and using the Facebook Pixel, have disclosed Plaintiff's and Class Members' personally identifiable information, including their Facebook IDs and the names of videos that they viewed on Dotdash Meredith's websites.

165.    Defendants' disclosure of Plaintiff's and Class Members' personally identifiable

information, including their Facebook IDs and the names of videos that they viewed on Dotdash
Meredith's websites, was willful.

166.    Plaintiff and Class Members did not consent to these disclosures.

## Count 3
### (California Online Privacy Protection Act,
### California Business and Professions Code § 22575)

167.    Plaintiff re-alleges and reincorporate the allegations in all preceding paragraphs.

168.    Defendants operate commercial websites that collect personally identifiable
information through the internet about individual consumers.

169.    Defendants did not, at all times relevant to this complaint, conspicuously post their
privacy policy on their websites, nor did they include a clear and conspicuous hyperlink to their
privacy policy.

170.    Defendants did not, at all at all times relevant to this Complaint, identify the
categories of personally identifiable information collected on their websites.

## Count 4
### (Violations of California Unfair Competition Law,
### California Business and Professions Code § 17200)

171.    Plaintiff re-alleges and reincorporate the allegations in all preceding paragraphs.

172.    The California Unfair Competition Law (California Business and Professions Code
§ 17200) prohibits "any unlawful, unfair or fraudulent business act or practice and unfair,
deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with
Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

173.    The acts and conduct of Defendants alleged above and herein constitute unlawful
business acts or practices prohibited by California Business and Professions Code § 17200. As
more fully alleged above, Defendants violated the VPPA, as well as California state privacy laws.

174.    The acts and conduct of Defendants alleged above and herein constitute unfair

business acts or practices prohibited by California Business and Professions Code § 17200. They offend established public policies and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and Class members. As more fully alleged above, Defendants unjustly enriched themselves at the expense, and to the detriment, of Plaintiff and members of the Class by, *inter alia*, unlawfully disclosing Plaintiff's and Class Members' personally identifiable information and video-viewing history.

## Count 5
### (New York General Business Law §§ 349 *et seq.*)

175.    Plaintiffs re-allege and reincorporate the allegations in all preceding paragraphs.

176.    Under New York General Business Law §§ 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

177.    The acts and conduct of Defendants alleged above and herein constitute "[d]eceptive acts or practices" within the meaning of New York law.

178.    Defendants IAC, Dotdash, and Dotdash Meredith are all located in the state of New York, and caused Class Member's personally identifiable information to be collected and disclosed to other third parties from the state of New York.

179.    As more fully alleged above, Defendants violated the VPPA and other laws.

180.    Defendants committed these deceptive acts and practices willfully and knowingly.

181.    As a result of Defendants' deceptive act and practices, Class Members have suffered substantial harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

A.      A declaration that this action is appropriate for class certification under Federal Rule of Civil Procedure 23 for all causes of action;

B.      A judgment against Defendants for violations of each of the causes of action alleged in this Complaint;

C.      Statutory damages of $2,500 per violation of the Video Privacy Protection Act, 18 U.S.C. § 2720(c)(2)(A);

D.      A civil penalty of $500 per violation of California Civil Code § 1799.3;

E.      Punitive damages under the Video Privacy Protection Act, 18 U.S.C. § 2720(c)(2)(B);

F.      Public injunctive relief under the Video Privacy Protection Act, 18 U.S.C. § 2720(c)(2)(D), California Civil Code § 1799.3, and California Business and Professions Code § 17200 prohibiting Dotdash Meredith from disclosing Registered Users' Facebook IDs and video-viewing history on People.com;

G.      The costs of this action, including attorneys' fees, expert fees, costs, and expenses under all applicable laws, including, without limitation, 18 U.S.C. § 2720(c)(2)(C) and California Code of Civil Procedure § 1021.5; and

H.      Any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  June 7, 2022

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
    Eric M. George
    Carl Alan Roth (*pro hac vice* forthcoming)
    Stefan Bogdanovich (*pro hac vice* forthcoming)
    Ryan Q. Keech (*pro hac vice* forthcoming)
    801 S. Figueroa Street, Suite 2000
    Los Angeles, California  90017
    Telephone: (213) 725-9800
    egeorge@egcfirm.com
    croth@egcfirm.com
    sbogdanovich@egcfirm.com

    Brett D. Katz
    152 West 57th Street, 28th Floor
    New York, New York 10019
    Telephone: (212) 413-2600
    bkatz@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP


By:  s/Brett D. Katz
    Brett D. Katz
    152 West 57th Street, 28th Floor
    New York, New York 10019
    Telephone: (212) 413-2600
    bkatz@egcfirm.com