IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| BRITTNEY STOUDEMIRE, AMANDA VOSE, LUCINDA JACKSON, DANA FOLEY, DOUGLAS CASTLE, and BARBARA GRAZIOLI, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LEE ENTERPRISES, INC.,<br><br>Defendant. | No.  3:22-cv-00086-SHL-SBJ<br><br><br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |

Plaintiffs have Facebook accounts and, separately, subscribe to one or more of Defendant Lee Enterprises, Inc.("Lee")'s online publications. Plaintiffs allege that the interplay between their Facebook accounts and subscriptions results in Lee sharing information about their video viewing history with Facebook, in violation of federal law. The Court concludes that Plaintiffs have stated plausible claims for relief and therefore DENIES Lee's Motion to Dismiss.

**I.     FACTUAL BACKGROUND.[1]**

Lee provides advertising and local news media in seventy-seven markets across twenty-six states, including, by way of example, through publications such as *The Buffalo News*, *Greensboro News & Record*, *Press of Atlantic City*, and *St. Louis Post-Dispatch*. (ECF 1, ¶¶ 20–25.) Lee is incorporated in Delaware and has its headquarters in Davenport, Iowa. (Id., ¶ 20.) Among other media-related services, Lee allows people to subscribe to newsletters or create accounts that give the subscribers access to online articles and video content. (Id., ¶ 3.) Each Plaintiff is a subscriber to at least one of Lee's online products. (Id., ¶¶ 14–19.) Each Plaintiff also has a Facebook account. (Id.) This case revolves around the triangulated relationship—and, especially, the sharing of information—between Lee, Facebook, and each Plaintiff.

---

[1] On a motion to dismiss, the Court accepts as true all well-pled facts and draws all reasonable inferences in the light most favorable to Plaintiffs. *Glick v. W. Power Sports, Inc*., 944 F.3d 714, 717 (8th Cir. 2019). The recitation of facts in the Background section is designed to be consistent with this standard and should not be construed as findings of fact for any other purpose

1

Facebook provides tools that allow web developers to monitor the activity of Facebook users on the developers' websites. (Id., ¶ 40.) The monitoring is provided or facilitated by the Facebook Pixel, which tracks certain user activities on non-Facebook websites and sends information about those activities to Facebook. (Id., ¶¶ 41, 43, 46.) The tracking is triggered by events such as a user loading a web page with "microdata" tags or an active "Domain Pixel" event. (Id., ¶ 47.) The presence of Pixel events can be confirmed using the Facebook Pixel Helper tool. (Id., ¶ 48.)

When a user logs into Facebook on a particular device, a "c_user cookie" is automatically created and stored on the device for up to one year. (Id., ¶ 44.) The c_user cookie includes the user's non-encrypted Facebook User ID number. (Id.) If the Facebook User ID number is added to www.facebook.com (as in, www.facebook.com/[UID_here]) on a web browser, the browser will go to the Facebook profile page for that user. (Id., ¶ 45.) If a Facebook user visits a non-Facebook website while: (a) a c_user cookie is active on the user's device; and (b) the Facebook Pixel is active on that website, the website will send a "request" to Facebook. (Id., ¶¶ 46, 49–50.) The following image, which is "derived from a developer's console monitoring the verification 'request,'" shows an example of the "Request Header" made from a Lee website to Facebook:



Figure 2 Press of Atlantic City sends c_user cookie to Facebook[23]

(Id., ¶¶ 51–52.) As the image illustrates, the user's c_user cookie is included in the request. (Id.) The method of attaching a user's Facebook User ID to Pixel requests is common across all Lee websites that track user activity. (Id., ¶ 53.) The same requests to Facebook include, *inter alia*, the title of video content viewed by the user. (Id., ¶ 54.) So, for example, if a Lee subscriber logs into Facebook on a device and later watches a video entitled "Peru's protests turn deadly" on the *Press*

*of Atlantic City* website on the same device, the video-watching information is shared with Facebook as part of the "request." (Id., ¶¶ 52, 65.) Facebook uses the data it obtains to create targeted advertising for the user based on what Facebook gleans about the user's interests from the activity on the non-Facebook website. (Id., ¶ 92.)

When a person subscribes to a Lee website or newsletter, Lee does not obtain the person's permission to share video-watching information with Facebook or other third parties. (Id., ¶ 111.) The newsletters also are not guided by a privacy policy or terms and conditions. (Id., ¶ 112.) Plaintiffs did not give Lee consent to share their video-watching information with Facebook. (Id., ¶ 120.) Lee provides titles, descriptions, or subject-matter of audio-visual materials when sharing Plaintiffs' information. (Id., ¶ 122.) Plaintiffs bring claims individually and on behalf of a putative class for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710. (Id., ¶¶ 138–40.) Plaintiffs seek declaratory relief, injunctive and equitable relief, statutory damages of $2,500 per violation, and reasonable attorneys' fees and litigation expenses. (Id., ¶ 154.) Plaintiffs do not, however, allege any specific injury from the alleged violations.

## II.     LEGAL BACKGROUND AND STANDARDS.

### A.    Motion to Dismiss Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court is not obligated to accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

### B.    The Video Protection Privacy Act.

The Video Protection Privacy Act ("VPPA") prohibits a "video tape service provider" from knowingly disclosing personally identifying information about a consumer to a third party in the

3

absence of informed, written consent or other narrow circumstances not relevant here. 18 U.S.C. § 2710(b). The VPPA gives a private right of action to aggrieved parties and allows them to recover, *inter alia*, "actual damages but not less than liquidated damages in an amount of $2,500." *Id*. § 2710(c)(2)(A). Congress passed the VPPA after a newspaper reporter obtained information about Judge Robert Bork's video rental history during hearings for his unsuccessful nomination to the United States Supreme Court in the late 1980s. *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). "[I]n order to plead a plausible claim under section 2710(b)(1), a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

### III.  LEGAL ANALYSIS.

#### A.  Plaintiffs Have Standing to Assert VPPA Claims.

Lee argues, first, that Plaintiffs do not have standing to assert their claims because they allege no economic, physical, reputational, or emotional injury beyond simply the statutory violation of the VPPA. Lee relies on cases like *Spokeo, Inc. v. Robins*, which held that "Article III standing requires a concrete injury even in the context of a statutory violation." 578 U.S. 330, 341 (2016). *Spokeo* further teaches that although Congress plays an "important role[]" in determining whether there has been a concrete injury, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id*. at 340–41. Instead, courts also must "consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id*. at 341.

The Court rejects Lee's position. Courts have consistently and repeatedly held that an alleged violation of the VPPA involving the unauthorized sharing of private information with a third party is enough to confer standing. *See, e.g.*, *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3d Cir. 2016). This is because the unauthorized sharing of private information has traditionally been recognized as a form of injury that would provide a basis for a lawsuit. *See id.* In the Ninth Circuit's words, "every 18 U.S.C. § 2710(b)(1) violation 'present[s] the precise harm and infringe[s] the

4

same privacy interests Congress sought to protect' by enacting the VPPA." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)).

Contrary to Lee's argument, nothing in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), changes this conclusion. *TransUnion* recognized the "disclosure of private information" as a type of concrete intangible harm that has been "traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 2204. It further held that class members whose inaccurate credit reports were disseminated to third parties had standing to pursue statutory claims under the Fair Credit Reporting Act. *Id.* at 2214. Here, as alleged, Plaintiffs' private information was disseminated to a third party, and thus *TransUnion* appears to confirm, rather than undermine, the conclusion of the courts that have found standing to exist in the context of similar claims under the VPPA. Accordingly, courts have continued to find standing in VPPA cases like this one since *TransUnion* was decided. *See Cantu v. Tapestry, Inc.*, No. 22-CV-1974-BAS-DDL, 2023 WL 4440662, at *4 (S.D. Cal. July 10, 2023); *Feldman v. Star Trib. Media Co. LLC*, --- F. Supp. 3d ----, 2023 WL 2388381, at *4 (D. Minn. Mar. 7, 2023); *Martin v. Meredith Corp.*, --- F. Supp. 3d ----, 2023 WL 2118074, at *2 (S.D.N.Y. Feb. 17, 2023). The Court agrees with these cases.

The Court similarly rejects Lee's argument that Plaintiffs' alleged injuries are not fairly traceable for Article III purposes to Lee's conduct, but rather are attributable to Plaintiffs' own actions in "allowing the Facebook Cookie to be installed on their devices and their failure to control their own privacy settings." (ECF 19-2, p. 20.) In *Feldman v. Star Tribune Media Company LLC*, Judge Tostrud rejected a nearly identical standing argument in a nearly identical case, explaining:

> Mr. Bernard [the defendant's declarant] describes steps Mr. Feldman [the plaintiff] might have taken to prevent his alleged injuries—that is, to prevent his video-viewing history from being shared with Facebook. The availability of these measures, however, does not show either that Mr. Feldman consented to the disclosure of this information or that his injuries were self-inflicted. The law doesn't ordinarily say that a plaintiff's failure to use available measures to avoid injury means the plaintiff consented to the injury. In tort law, a plaintiff's failure to take advantage of an opportunity to avoid injury ordinarily matters, if at all, with respect to causation, a merits question. Regardless, no case has been cited adopted or applying such a rule in the Article III context. Though it seems conceivable that a plaintiff's refusal to take advantage of plain chances to avoid injury might be so extreme as to justify the conclusion that a sued-for injury is

> self-inflicted, the facts alleged by Mr. Feldman and described by Mr. Bernard do not show that this is that kind of case.

2023 WL 2388381, at *7. This Court likewise concludes that Lee's argument, although relevant to the merits, does not warrant dismissal for lack of Article III standing.

### B. Plaintiffs Have Stated a Plausible Claim for Relief.

The remaining issues revolve around the merits, starting with Lee's argument that, as alleged, it did not "knowingly disclose . . . personally identifiable information" to Facebook as required to state a claim for violating 18 U.S.C. § 2710(b). Instead, Lee argues that any disclosures result from the presence of the c_user cookies on Plaintiffs' devices after they logged into their Facebook accounts. Lee further argues that "there are no allegations that Lee [] linked an individual consumer's identity to their Facebook [user ID], or actually knows or learns the identity of any specific consumer from the Facebook Cookie or Facebook Pixel." (ECF 19-2, p. 22.) Finally, Lee argues that an "ordinary person" would not be able to identify any Plaintiff's video-watching history simply by looking at the code transmitted from Lee to Facebook, and the Complaint does not allege any specific video that any Plaintiff viewed anyway. (Id., pp. 23–26.)

Lee's arguments highlight the challenge that comes with applying the three-way relationship between Lee, Facebook, and consumers to a statute that was enacted primarily with two-way relationships (between video providers and consumers) in mind. Lee argues that because each consumer's c_user cookie and Facebook User ID could not be transmitted from Lee to Facebook unless that consumer earlier signed into Facebook, the situation here is akin to a consumer inviting a friend to join them at the counter of an erstwhile brick-and-mortar video store. Sure, Lee admits, the friend can learn which videos the consumer rented, but this is primarily a consequence of the consumer's own actions. Plaintiffs, by contrast, argue that: (a) the c_user cookie and Facebook User ID would be irrelevant if Lee did not make the separate decision to "implement" the Facebook Pixel; and (b) Lee never warns consumers that it has implemented the Pixel. Both sides are correct in some sense or another, and thus the question is how the statute applies in these circumstances.

The starting point is the text of the statute itself, which, subject to a handful of exceptions, imposes liability on a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). Based on the text, "in order to plead a plausible claim under section 2710(b)(1), a

plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett*, 795 F.3d at 1066. Both sides appear to agree, at least for present purposes, that Lee qualifies as a "video tape service provider," and thus Lee's motion to dismiss revolves around the second, third, and fourth elements.

1. The Complaint Plausibly Alleges the Sharing of "Personally Identifiable Information" as Defined in the VPPA.

Section 2710(a)(3) states that "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." Courts have wrestled with how to apply this definition to electronic identifiers that could not alone identify a person but sometimes can be combined with other information to do so. At least two appellate courts have applied an "ordinary person" standard to determine whether such information qualifies under the statute; as in, "personally identifiable information under the [VPPA] means the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 290; *accord Eichenberger*, 876 F.3d at 985. These courts have concluded that "static digital identifiers" such as an IP address do not constitute "personally identifiable information" even though it is possible to combine those identifiers with other information to ascertain a person's identity. *See, e.g.*, *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 286. The Third Circuit explained that Congress intended to prevent the disclosure of information "that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *Id.* at 284. In the Third Circuit's view, static digital identifiers are too complicated to qualify.

The First Circuit took a somewhat different approach in *Yershov v. Gannett Satellite Information Network, Inc.*, holding that "personally identifiable information" refers to information "reasonably and foreseeably likely to reveal" the person's identity. 820 F.3d 482, 486 (1st Cir. 2016). Under this approach, *Yershov* held that "personally identifiable information" was broad enough to include a user's GPS coordinates and device identifiers when the recipient of that information had the ability to link it to a specific name, address, and phone number. *See id. Yershov* explained that this conclusion was consistent with Congress's decision to define "personally

7

identifiable information" in an "abstract" way, which the First Circuit interpreted to mean Congress did not want to limit the definition to "information that explicitly names a person." *Id.*

The Court agrees with *Yershov*'s broader approach. Congress enacted the VPPA because it did not want consumers' video-viewing history to be shared with third parties. Against this backdrop, it is difficult to understand why the governing question would be the ability of a hypothetical "ordinary person" to determine the consumer's identity when the information is shared. The better question is whether the *intended third-party recipient* can make that determination and is reasonably expected to do so. The *Yershov* test reflects this by focusing on what is "reasonable and foreseeable" in context. Here, as alleged, the "personally identifiable information" is the consumer's Facebook User ID. It is obviously "reasonable and foreseeable" that Facebook would translate that information into a person's actual identity; indeed, as alleged in the Complaint, Facebook literally does this by taking the information about the user's third-party website activity to tailor the Facebook advertising for that user. It follows that the Facebook User ID is "personally identifiable information" for purposes of the VPPA. *See id.*; *see also Feldman*, 2023 WL 2388381, at *9 (concluding that the plaintiff's Facebook User ID was "personally identifiable information").

Like *Yershov*, the Court believes this approach does the best job of capturing Congress's intent when it enacted the VPPA in 1988. The impetus for the statute was a video rental company's sharing of Judge Bork's video rental history to a reporter during Bork's Senate confirmation hearings. *See Yershov*, 820 F.3d at 485. The video rental company could, in theory, have engaged in cloak-and-dagger communications with the reporter involving winks and nods or coded language like "Customer Number Nine" that an ordinary person could not have attached to Bork. It is difficult to imagine, however, that Congress intended to let the video provider off the hook in such circumstances. Instead, the "abstract" definition of "personally identifiable information" was designed to recognize the wide range of methods by which someone's video-viewing history might be shared with a third party. *See In re Hulu Privacy Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *11 (N.D. Cal. Apr. 28, 2014) ("One can be identified in many ways: by a picture, by pointing, by an employee number, by the station or office where one works, by telling someone what 'that person' rented.").

To that end, it bears repeating that, as alleged in the Complaint, Facebook *actually uses* Plaintiffs' video-viewing history to shape the advertising Plaintiffs receive. In other words,

regardless of what an "ordinary person" could have done with the c_user cookie, Facebook connects the c_user cookie to a specific person and uses it in conjunction with the video-viewing history to tailor how Facebook itself interacts with that person. This may not have been the scenario Congress envisioned when it passed the VPPA, but it falls within the statutory language if the other elements of the statute are satisfied.

2. The Complaint Plausibly Alleges That Lee Made Knowing Disclosures in Violation of the VPPA.

The next question is whether the Complaint alleges enough facts to make Lee plausibly liable for knowingly disclosing Plaintiffs' video-viewing information, or if the Complaint instead establishes as a matter of law that Plaintiffs themselves are responsible for the disclosures by signing up for and logging into Facebook in the first place. Most courts have denied motions to dismiss in circumstances like those present here. With some hesitation, the Court reaches the same conclusion.

The Court hesitates because the Complaint appears to be artfully drafted in some respects. As alleged, one of the keys to the sharing of information between Lee and Facebook is the presence of the Facebook Pixel on the Lee websites. The Complaint never clearly alleges, however, how the Pixel ends up there. At most, the pleading merely alleges that Lee "implements" or "utilizes" the Pixel. This word choice is curious, and the Court cannot tell whether: (a) Lee consciously and deliberately chose to place the Pixel on its websites; (b) the Pixel was installed by default when Lee created its Facebook account; (c) the decision to place the Pixel on the Lee websites was made by a web developer, not Lee itself; or (d) none of the above.[2] The answer might matter to whether Lee made a "knowing" disclosure in violation of the VPPA.

Other aspects of the Complaint also raise questions. For example, it is strange that the alleged transmittal of video-viewing information occurs in connection with what the Complaint characterizes as a "request" by Lee to Facebook. This seems backwards: usually a person would not share information with a third party by "requesting" something *from* the third party. Moreover, and perhaps more importantly, the "request" contains the user's c_user cookie and Facebook User

---

[2] Plaintiffs' Response to Defendant's Motion to Dismiss goes further than the Complaint by citing a Facebook webpage for the proposition that "[w]ebsite owners make use of the Facebook Pixel by 'placing the [Facebook] Pixel base code on all pages of [their] website[.]'" (ECF 27, p. 7.) This implies a conscious decision on Lee's part to install the Facebook Pixel, although it remains possible that the placement is automatic and/or the decision was made by a third-party web developer.

ID, which, as the Court understands it, Lee would not know independently. Instead, the c_user cookie and Facebook User ID end up in the "request" only because they were stored in the consumer's web browser in the first place. Lee's use of the Facebook Pixel is therefore arguably analogous to a brick-and-mortar video store's use of glass windows near the cash register. Yes, the glass windows might allow a bystander to see which videos are being rented by someone the bystander already knows; but, no, this is not the harm Congress was trying to redress.

There is, however, an alternative analogy that might be more apt. Perhaps the situation is more akin to a bystander who sees someone familiar—let's call him "Robert Bork"—leaving the video store and runs up and says to the clerk, "that was Robert Bork. What did he just rent?" Although the video store may not have previously known the customer's identity, it likely would violate the VPPA if it gave rental information in response to the bystander's question. *See In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 ("Throwing Judge Bork's video watch list in the recycle bin is not a disclosure. Throwing it in the bin knowing that the Washington Post searches your bin every evening for intelligence about local luminaries might be.").

The Court cannot tell from the Complaint which analogy, if either, is a better fit. It simply does not have enough information about, *inter alia*: (a) how the Pixel ends up on the Lee websites; (b) what Lee is told about how the Pixel will operate; and (c) the Facebook Terms of Service. The Court therefore must conclude, for present purposes, that the Complaint has plausibly alleged that Lee "knowingly disclosed Plaintiffs' . . . personally identifying information to Facebook," including "the title of the videos they viewed." (ECF 1, ¶¶ 148–49.) *See Belozerov v. Gannett Co.*, --- F. Supp. 3d ----, 2022 WL 17832185, at *4–5 (D. Mass. Dec. 20, 2022) (denying motion to dismiss); *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *3–4 (S.D.N.Y. Dec. 15, 2022) (same); *see also Feldman*, 2023 WL 2388381, at *10 (noting that "most district courts" have denied motions to dismiss in similar circumstances).

In reaching this conclusion, the Court is intentionally not deciding anything about the significance of the Facebook Terms of Service, which are not expressly mentioned in the Complaint but were attached to Lee's Motion to Dismiss. (ECF 19-4.) The Court cannot tell from the face of the Complaint when each Plaintiff signed up for Facebook, what the Terms of Service said at that time, how the Terms of Service were communicated, or any number of other pieces of information that might be relevant to the viability of Plaintiffs' claims. The Court therefore will not consider the Facebook Terms of Service until the factual record is developed.

## IV. CONCLUSION.

Because the Complaint plausibly alleges violations of the VPPA, the Court DENIES Lee's Motion to Dismiss (ECF 19).

Dated: July 20, 2023.

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE